**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION**

UNITED STATES OF AMERICA,
     Plaintiff,

                              Case No. 23-CR-20676

vs.

                              Hon. Thomas L. Ludington

D-3 ADAM BALL,
     Defendant,
_____/

**DEFENDANT BALL'S MOTION
TO SUPPRESS STATEMENT
(Including a Request for an Evidentiary Hearing)**

Defendant Adam Ball, by and through his Counsel, respectfully moves this Court to suppress evidence his statement to law enforcement unlawfully obtained during the raid and interrogation conducted on July 25, 2019, and requests an evidentiary hearing to address contested issues of fact regarding the legality of the interrogation based on the following:

1.    Defendants Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, Anthony Thelen, and Adam Ball are charged with conspiracy to commit wire fraud, conspiracy to defraud the United States, and wire fraud.

2.    These charges arise from alleged fraudulent activities involving Surveying Solutions, Inc. (SSI), a company that received highway construction contracts from the Michigan Department of Transportation (MDOT), funded by the

United States Department of Transportation (USDOT). The Defendants are accused of creating shell companies and falsifying documents to inflate overhead costs and fraudulently obtain reimbursements from MDOT.

3.  On July 25, 2019, FBI agents executed nine search warrants on the Defendants' business and personal addresses. During the search of the SSI office, Adam Ball was detained and interviewed by FBI officers Steven Larsen and Douglas Smith. Ball was questioned about his involvement with SSI and Southfield IT, including the formation, ownership, and financials of the company.

4.  Ball was not given his Miranda rights, and the agents' proceeded to interrogate Defendant Ball about the allegations in the Present Case.

5.  Defendant Adam Ball was in custody for purposes of *Miranda* when he was interrogated during the raid. The environment conveyed that Ball was not free to leave, as he was interrogated in his office with police blocking his access to the door and his phone. The interrogation met the criteria for custodial interrogation, including the location, length, and manner of questioning, and the restraint on Ball's freedom of movement. The totality of the circumstances indicates that Ball's freedom of movement was restricted to a degree associated with formal arrest, necessitating the suppression of his statements to the police.

6.  Defendant requests that the Court hold an evidentiary hearing to address contested issues of fact regarding the legality of the search and interrogation,

including the number of officers involved, whether firearms were displayed, and the separation process used during the raid. An evidentiary hearing is necessary to determine the validity of the search and the admissibility of Ball's statements.

7.     The Undersigned Counsel sent an email to the attorneys for the Government on December 20, 2024, asking for their concurrence to the requested relief. The Government replied by email on December 20, 2024, denying that concurrence.

8.     For the foregoing reasons, Defendant Adam Ball respectfully requests that this Court grant his motion to suppress evidence obtained during the raid and interrogation on July 25, 2019, and hold an evidentiary hearing to address the contested issues of fact.

WHEREFORE, Defendant asks this Court to hold an evidentiary hearing and then suppress his statements to the police.

Respectfully submitted,

*/s/Mark A. Satawa*

_____
MARK A. SATAWA (P47021)
Attorney for Defendant Ball
26777 Central Park Blvd, Suite 300
Southfield, MI 48076
(248) 356-8320

DATED:  December 20, 2024

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have served all counsel of record of this Notice through the ECF system.

Respectfully submitted,

/s/Mark A. Satawa

_____
MARK A. SATAWA (P47021)
Attorney for Defendant Ball
26777 Central Park Blvd, Suite 300
Southfield, MI 48076
(248) 356-8320

DATED:  December 20, 2024

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

UNITED STATES OF AMERICA,
     Plaintiff,

Case No. 23-CR-20676

vs.

Hon. Thomas L. Ludington

D-3 ADAM BALL,
     Defendant,

_____/

## DEFENDANT BALL'S BRIEF IN
## SUPPORT OF MOTION TO SUPPRESS
## (Including a Request for an Evidentiary Hearing)

## FACTS

The Indictment in the Present Case charges Defendants Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, Anthony Thelen, and Adam Ball with multiple counts of conspiracy to commit wire fraud, conspiracy to defraud the United States, and wire fraud. The Defendant denies these allegations.

### A. The Charges.

This Case revolves around disputed fraudulent activities involving Surveying Solutions, Inc. ('SSI'), a surveying company that received highway construction contracts from the Michigan Department of Transportation (MDOT), which were

funded by the United States Department of Transportation (USDOT).[1] The Defendants are accused of creating shell companies and falsifying documents to inflate overhead costs and fraudulently obtain reimbursements from MDOT.

### B. The Raid and Interrogation

On July 25, 2019, several FBI agents executed nine search warrants on the Defendants' business and personal addresses. During the search of the SSI office located at 4471 M-61, Standish, Michigan, Adam Ball was detained and interviewed by FBI officers Steven Larsen and Douglas Smith.

Importantly, as part of the "raid plan," Government agents were instructed and tasked with using Special Agent Smith to identify and "restrain"[2] all "[n]ecessary SSI staff . . . for interviews," while "all other non-essential employees will be permitted to leave the business."[3] Then, after warrant was announced and executed, "as part of the initial process of securing the location all employees were brought to

---

[1] This section of the Brief paraphrases the Government's Second Superseding Indictment. It should not be treated as an admission of any facts in that Indictment.

[2] Meaning prevent them from leaving so they could be interviewed.

[3] *See* discovery, SSI-USDOT_000000823, attached to this pleading as an Exhibit.

the lower level of the business and asked to present identification."[4] After presenting identification, the target employees were detained and questioned, while others were "identified and released from the search location."[5] Defendant Ball was one of the targets that was detained and not allowed to leave.

Instead, an agent (apparently recognizing him) approached him and said, "aren't you Adam Ball?" After Mr. Ball confirmed his identity, the agents said they needed to interview him and asked if he knew of "a quieter place to hold the interview." In response, Mr. Ball showed the agents his assigned office. At the beginning of the interview, the agents told Mr. Ball that he needed to either turn his phone off or put it into airplane mode.

Mr. Ball sat at his desk, and the officers placed themselves in his office, one seated between Mr. Ball and the door, and the other near a window in the office. The agents began to interrogate Mr. Ball about the allegations in the Present Case. These interrogations were a series of declarative statements, which presupposed the truth behind the question, and offered only one acceptable answer. In other words, they were not questions at all but demands from the agents for Mr. Ball to agree with their predetermined view of the facts behind the allegations.

---

[4] *See* discovery, SSI-USDOT_000004085, attached to this pleading as an Exhibit.

[5] *Id.*

The agents did inform Mr. Ball about his right to refuse to answer any questions. However, when Mr. Ball asked if he should have an attorney present, they told him that while it was his right to do so but that they couldn't answer that question for him. The officers immediately proceeded with their interrogation, which lasted over two hours.

This line of declarative interrogation included "statements" regarding his ownership of the company, how the company was formed, what his role was there, and what services this company provided to SSI. The agents then began confronting Mr. Ball with additional declarative statements regarding Southfield IT financials, and how much money Mr. Ball made per year.

Transcriptions of Mr. Ball's interrogation were made available as part of the discovery from the Government in this Case, and redone by the Defense to check accuracy.[6] Agent Larsen's declarative statements to Mr. Ball include the following:

> 23:14: "All right. That's that's one hurdle. We had to we had to clear, and we've cleared it. Okay. So, I guess let's let's just jump right into why was the shell company established?"

> 23:51: "Let's again, let's, let's, let's continue. Why? Why was Southfield IT group established? It's obvious to me based on what you've told us, that you don't have much of an IT background. And you've told me the only two employees are you and your wife and that your only clients are SSI. So, let's, let's, let's finish the explanation here. Well, why was it set up? Who decided to set it up? Who was involved? Et cetera, et cetera?"

---

[6] The transcripts will be provided as an Exhibit at any Hearing ordered by the Court. Each transcript is over 100 pages, so they were not attached to this Pleading.

25:25: "I mean, you've it Adam, you you've been is so far you but you've been nothing but but forthright with with us from what I can tell. I mean, you've admitted that the that Southfield IT group is a shell company. What we need to know now is why? Why was it set up as a shell company? Who was involved in that decision making process? Let's finish the explanation."

54:39: "And then, just to kind of clarify what what you said so far. Regarding why checks were cut from Southfield IT Group to Sarah instead of just yourself. It was because Sarah owns a percentage of Southfield IT Group. I'm pretty sure that rather than write everything to yourself you should proportional to the ownership interest. Okay, so that's why Sarah got money from Southfield IT Group despite not doing any work. Okay. Yeah, we're just gonna let that ring if you don't mind."

Defendant Ball was never given his Miranda rights. The Defendant requests that this Court enter an Order granting him an evidentiary hearing, and upon conclusion of the evidentiary hearing enter an Order suppressing his statements.

## ARGUMENT

I. **THE DEFENDANT WAS IN CUSTODY FOR PURPOSES OF *MIRANDA V. ARIZONA* WHEN POLICE RAIDED HIS WORKPLACE, SORTED SUSPECTS FROM NON-SUSPECTS, RELEASED NON-SUSPECTS, AND INTERROGATED DEFENDANTS IN SEPARATE ROOMS IN AN ENVIRONMENT CONVEYING THEY WERE NOT FREE TO LEAVE, DESPITE THE LOCATION BEING THE DEFENDANT'S OWN OFFICE.**

Mr. Ball was placed in custody for Miranda's purposes, where during the execution of a search warrant at SSI, Government agents required everyone to present their ID, identified and detained the target employees for interviews, and allowed all "non-essential employees" to leave after showing their ID.  Then, after warrant was announced and executed, Defendant Ball was one of the targets that was detained, and multiple law enforcement officers isolated him in his office and interrogated him for over two hours.

With multiple law enforcement on the premises, Mr. Ball was interrogated in his office, wherein one officer was stationed between Mr. Ball and the door to his office. In addition, Mr. Ball was prohibited from using his cell phone during the interrogation.  Given the totality of the circumstances, a reasonable person in Mr. Ball's position would have felt that he was not free to leave.

## A.    *Miranda Generally.*

The Fifth Amendment provides that "[n]o person . . . shall be compelled in  any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, the    Supreme Court has held that in specific contexts, police must issue *Miranda* warnings before interrogating a suspect in their custody.[7]

In order to be able to use statements obtained during custodial interrogation of the accused, the government must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation."[8] *Miranda* stands for the principle that not only confessions but any statement by the defendant in violation of *Miranda* - "whether inculpatory or exculpatory - that the prosecution may seek to introduce at trial" should be suppressed.[9]

A prosecutor may not use a defendant's statements stemming from custodial interrogation unless the prosecutor can demonstrate the use of procedural safeguards that effectively secure a defendant's privilege against self-incrimination.[10]  Unless

---

[7] *See Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *United States v. Lester*, 98 F.4th 768, 773 (6th Cir. 2024)

[8] *Fare v. Michael C.*, 442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979); *Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (reaffirming *Miranda*).

[9] *Rhode Island v Innis. supra*. 301 fn 5; Miranda*,* 384 U.S. *at* 476-477.

[10] *Miranda*, 384 U.S. at 444.

other means are devised to inform a suspect of his right to silence and a "continuous opportunity to exercise it," the following warnings are required to be given to a suspect:[11]

1. the person must be warned that he has a right to remain silent;

2. that any statement he does make may be used against him;

3. and that he has a right to the presence of an attorney, either appointed or retained.

"Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the right to assistance of counsel during a custodial interrogation."[12] "[T]he prosecution may not use statements obtained through custodial interrogation in the absence of the specific rendering of the Miranda warning."[13]

> B.   *The Defendant Was In Custody and Interrogated Within the Meaning of Miranda.*

"'Interrogation' includes 'express questioning or its functional equivalent.'"[14] "The 'functional equivalent' of express questioning includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that

---

[11] *Miranda*, 384 U.S. at 444.

[12] *Tolliver v. Sheets*, 594 F.3d 900, 916 (6th Cir. 2010).

[13] *Id.* at 917.

[14] *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

the police should know are reasonably likely to elicit an incriminating response from the suspect.'"[15]

It is beyond debate that questioning of Mr. Ball was an interrogation. The questioning was such that it was clear that he was a target/suspect, and that the questioning was designed to elicit an incriminating response. He was questioned about alleged fraud and told (**and not asked**) that his IT company was a shell company.

Thus, the only question to be decided is whether Mr. Ball was in custody requiring that the agents advise him of his Miranda rights.

Several factors guide the inquiry whether a person is in custody: the location of the interview, the length and manner of questioning, whether the individual possessed unrestrained freedom of movement during the interview, and whether the individual was told she need not answer the questions.[16]

---

[15] *Id.* (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600–601, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990)).

[16] *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).

C.   *Even Though the Interrogation Took Place in His Own Office, the Overwhelming Police Presence, the Police Control of the Environment, and Their Limitations on the Defendant's Movement Were Such that this Court Should Find "Custody" Under Miranda.*

The obligation to administer a Miranda warning to a person arises when an individual is in custody. "For an individual to be 'in custody,' there must be a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."[17]  With respect to the Fifth Amendment test, the *Knox* Court stated: "The test is an objective one: would a reasonable person in the defendant's position have felt that he was under arrest or was 'otherwise deprived of his freedom of action in a significant way.'"[18]

The Sixth Circuit has laid out four non-exhaustive factors to guide the inquiry: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions."[19]

_____

[17] *United States v. Mahan*, 190 F.3d 416, 421 (6th Cir. 1999) (citing *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)). See also *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003).  A determination of whether a person is in custody for purposes of *Miranda* is not coterminous with that of a Fourth Amendment seizure.  *United States v. Hall*, No. 5:23-CR-00142-GFVT-MAS, 2024 U.S. Dist. LEXIS 141831, at *16 (E.D. Ky. June 24, 2024) (finding custody during a roadside stamp).

[18] *Knox* citing *Miranda*, 384 U.S. at 477.

[19] *Panak*, 552 F.3d at 465. *See also Thompson*, 516 U.S. at 1122 (asking "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?]").

The ultimate question courts must answer is whether, based on the totality of the circumstances, a suspect's movement was restricted to a degree associated with a formal arrest.[20]  A law enforcement officer's view of when the arrest occurred is not what matters; detention amounts to an arrest when, by either physical force or "submission to the assertion of authority," a person's freedom of movement is restrained by the Government.[21]

 As the United States Supreme Court has explained, the police-should-know test "focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the  Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police".[22] The assessment of the suspect's perceptions is predicated upon a "reasonable person" standard rather than a subjective standard, because "the police surely cannot be held accountable for the unforeseeable results of their words or actions."[23]

---

[20] *Panak*, 552 F.3d at 465t 465.

[21] *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991).

[22] *Innis*, 446 U.S. at 301.

[23] *Innis*, 446 U.S. at 301-302.

Custodial interrogation applies to any questioning of a person involuntarily detained in closed quarters. Even though those quarters may be the person's own home, the questioning may be wholly unrelated to the reason for the detention."[24]

If the police set in motion "compelling influences [or] . . psychological ploys" that "implicate this purpose" and create an "atmosphere of oppressive police conduct," their behavior "properly could be treated as the functional equivalent of interrogation."[25]

A law enforcement officer's view of when the arrest occurred is not what matters. Detention amounts to custody when, by either physical force or "submission to the assertion of authority," a person's freedom of movement is restrained by the Government.[26]

> D. *The custody factors are sufficiently close to the fact that an evidentiary hearing is required.*

Custodial interrogation applies to any questioning of a person involuntarily detained in closed quarters. This applies even though those quarters may be the

---

[24] *Mathis v. United States*, 391 U.S. 1, 88 S. Ct. 1503, 20 L. Ed. 2d 381 (1968).

[25] *Mauro, supra*, 527-530, 528 fn 5.

[26] *Hodari D*., 499 U.S. at 626.

person's own home (or office), and even though the questioning may be wholly unrelated to the reason for the detention."[27]

Here, Mr. Ball was interviewed in his own office. While the agents did tell him in passing that he was not under arrest, they never told him that he was free to leave, or not participate in the interrogation. The totality of the situation shows that he was in custody, and a reasonable person would not have felt free to leave.

It is axiomatic that a lay person may not understand, the way a law enforcement officer does, that being told you are not under arrest is not the equivalent of being told you are free to leave. This is particularly true where, as is true in the Present Case, Mr. Ball was surrounded by law enforcement officers, who checked the identification for every employee, allowed certain employees to leave the building once their identification was checked, but detained other employees such as Mr. Ball for interrogation. Under these circumstances, it is not unreasonable for a person to think that they were in custody and under arrest, and that being in custody meant that they were ultimately going to be taken to the police station for processing.

---

[27] *Mathis v. United States*, 391 U.S. 1, 88 S. Ct. 1503, 20 L. Ed. 2d 381 (1968).

During the interview, Government agents were executing a search warrant and engaging in a raid of the same building pursuant to a warrant.[28] The police stopped Defendant Ball from using his cell phone, which cut off his contact with the outside world.  When one is prevented and/or discouraged from communicating with others, during an FBI raid, that is a strong suggestion that any "alleged" freedom is illusory. This is 2024, and the small (but fully functional) computers we all carry around called cell phones dominate nearly every facet of our lives. In this cell phone world, most individuals live more of their life in the virtual world afforded by this minicomputer – where one leaves a "room" or "conversation" on their phone, without actually moving. We are constantly barraged with texts, emails, calls, and posts of every description. Denying access to one's handheld personal computer, even for a short period of time, is its own form of custody.

The Defendant was exposed to a police dominated environment, with police swarming the building, everywhere you would look.[29] The officers were in "uniform" in the sense that they were clearly identified as FBI agents or other law enforcement officers, were carrying guns and badges. The police quite literally took

---

[28] As used in this Brief, the term "police" is being used as an umbrella term to include all law enforcement agents involved in the execution of the search warrant and or search warrant.

[29] *Cf Aguil v. Noman,* No. 1:21-cv-01666-JLT-SKO (HC), 2022 U.S. Dist. LEXIS 25571 (E.D. Cal. Feb. 11, 2022).

total control over SSI's offices, sealing them off, and even determining who could leave vs. who was required to stay. The fact that the Defendant was interrogated outside of a police station may favor a finding of no custody, but it is certainly not dispositive.[30]

Custody for purposes of *Miranda* is not a mechanistic inquiry (e.g. an interrogation in the Defendant's office or his own home is per se not "custody" as a matter of law). As one federal court noted:[31]

> However, the lessened risk of coercion in a familiar setting "does not allow for a simple in-home vs. out-of-home dichotomic analysis," United States v. Cavazos, 668 F.3d 190, 194 (5th Cir. 2012), because "[t]o look only at any single factor would be inconsistent with Miranda's role as a protection against coercion . . . in a police-dominated atmosphere." FNULNU, 653 F.3d at 154 (internal quotation marks omitted). Instead, "when applying Miranda to the task of sorting a non-custodial in-home interrogation from a custodial one, [the court's] analysis considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" United States v. Craighead, 539 F.3d 1073, 1083-84 (9th Cir. 2008) (listing factors relevant to determining whether there was a police-dominated atmosphere as "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made").

---

[30] *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990) (Defendant was in custody in his own home for purposes of Miranda).

[31] *United States v. Sergi*, No. 5:12-cr-100, 2013 U.S. Dist. LEXIS 42054, at *10-11 (D. Vt. Mar. 26, 2013).

There are multiple factors that favor a finding that Mr. Ball was in custody when questioned in his office. The interrogation took more than two hours, and interviews longer than two hours typically weigh in favor of finding custody.[32]

Discouraging an interviewee from answering calls from their spouse does restrain their freedom.[33] The fact that the Defendant was told he was not under arrest is obviously one factor in determining whether Mr. Ball was in custody, but it is not dispositive. Where the police actions contradict their words, an individual can still be in custody for purposes of *Miranda*.[34] No reasonable person would have felt free to leave under the facts of this case.[35]

---

[32] *See, e.g., Yarborough v. Alvarado*, 54; U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018).

[33] *United States v. Grenkoski*, 645 F. Supp. 3d 669, 677 (E.D. Ky. 2022); *United States v. Levenderis*, 806 F.3d 390, 400–01 (6th Cir. 2015)2015) ("Defendant was also able to place and receive phone calls during the interviews, something a reasonable person in police custody would not feel free to do."). The Court agrees with Judge Ingram's conclusion that this restriction on his ability to use his phone "weighs in favor of custody, but not terribly heavily").

[34] *See, e.g. Craighead*, 539 F.3d 1073*; State v. Winegar*, 147 Ariz. 440, 711 P.2d 579 (1985); State v. Jolly, 2013 Ariz. Super. LEXIS 156. As one District Court stated. If the police set in motion "compelling influences [or] . . . psychological ploys" that "implicate this purpose" and create an "atmosphere of oppressive police conduct", their behavior "properly could be treated as the functional equivalent of interrogation." *Mauro, supra*, 527-530, 528 fn 5.

[35] Cf. *United States v. Hall*, No. 5:23-CR-00142-GFVT-MAS, 2024 U.S. Dist. LEXIS 141831, at *17 (E.D. Ky. June 24, 2024). Thus, a prima facie case of custody has been made out.

E.              *The Police Perceptions Have Minimal Value.*

The agents will, in all likelihood, testify that they did not consider Mr. Ball in custody when questioned.  However, this is not legally significant.

As the United States Supreme Court has explained, the police-should-know test "focuses primarily upon the perceptions of the suspect rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police". *Innis, supra* at 301. The assessment of the suspect's perceptions is predicated upon a "reasonable person" standard, rather than a subjective standard, because "the police surely cannot be held accountable tier the unforeseeable results of their words or actions."[36]

*Miranda* stands for the principle that not only confessions but any statement by the defendant in violation of *Miranda* - "whether inculpatory or exculpatory - that the *prosecution* may seek to introduce at trial" should be suppressed.[37]  A law enforcement officer's own view of when the arrest took place is not what matters: a detention amounts to an arrest when, by either physical force or "submission to the

---

[36] *Innis, supra*. 301-302.

[37] *Rhode island v Innis. supra*. 301 fn 5: and Miranda, *supra*. 476-477.

assertion of authority," a person's freedom of movement is restrained by the Government.[38]

The ultimate inquiry is whether, under the totality of the circumstances, the individual's freedom of movement was restrained to a degree associated with formal arrest. *United States v. Christian*, 2023 U.S. Dist. LEXIS 218063.

F.          *This Court Must Hold an Evidentiary Hearing*

In the Sixth Circuit, a District Court must hold an evidentiary hearing on a defendant's motion to suppress if the defendant sets forth contested issues of fact that bear upon the legality of the search. The motion must be sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.[39] This includes the number of officers on the raid, whether firearms were displayed during the search, the police activities before the question of this Defendant, and the separation process used where some SSI employees were told that they were free to leave and others were questioned.

---

[38] Hodari D., 499 US at 26.

[39] *United States v. Thompson*, 16 F. App'x 340 (6th Cir. 2001); *Daniel Major*, 2022 U.S. Dist. LEXIS 196587; *United States v. Butler*, No. 21-20235, 2021 U.S. Dist. LEXIS 145710 (E.D. Mich. Aug. 4, 2021).

## **RELIEF**

WHEREFORE, Defendant asks this Honorable Court to hold an evidentiary

hearing, and then suppress his statements to the police.


Respectfully submitted,


/s/Mark A. Satawa

_____

MARK A. SATAWA (P47021)
Attorney for Defendant Ball
26777 Central Park Blvd, Suite 300
Southfield, MI 48076
(248) 356-8320


DATED:  December 19, 2024

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have served all counsel of record of this Brief

through the ECF system.

Respectfully submitted,

*/s/Mark A. Satawa*
_____
MARK A. SATAWA (P47021)
Attorney for Defendant Ball
26777 Central Park Blvd, Suite 300
Southfield, MI 48076
(248) 356-8320

DATED:  December 20, 2024