United States District Court
Eastern District of Michigan
Southern Division

United States of America,

   Plaintiff,

v.

D-3 Adam Ball,

   Defendant.

Case No. 23-cr-20676

Hon. Thomas L. Ludington

_____

## United States' Response to Adam Ball's Motion to Dismiss Statement [178] and Brief in Support
_____

Claiming he was "in custody" at the time he gave a statement to FBI agents in his SSI office, Adam Ball (Ball) seeks to suppress his statement because he was not given *Miranda* warnings. What constitutes an in-custody interrogation is determined using two discrete inquiries – what were the circumstances surrounding the interrogation and would a reasonable person have felt they were not at liberty to end the interrogation and leave. Courts are required to use an objective test based on the totality of circumstances to determine whether there was "a formal arrest or restraint on freedom of movement to a degree

1

associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99 (1995). Here, at the very beginning of the interview, an agent told Ball that they were there "… to try to get some answers. Uh no one's under arrest. Nobody's getting cuffs, nothing like that." (Exh. A – Ball Interview Transcript, July 25, 2019, pg. 3).[1] The agents went on to assure Ball that it was his right not to answer questions. Ball elected to continue the interview. *Id.*

Ball was interviewed in his office at the SSI Standish, Michigan office building. Ball's office door included a window facing the interior of the building and the office had a window facing the parking lot. (Exh. C – Photograph). During the interview, Ball sat behind his desk and the interviewing agents sat in guest chairs in front of Ball's desk. (Exh. D – Photograph). Ball's office door remained unlock throughout the interview, and he was told he could stop the interview if he wished. No physical restraint or show of force was used at any time. Under nearly identical factual circumstances, the Sixth Circuit has repeatedly held

---

[1] Exhibit A is a revised transcript of the audio recording of Ball's July 25, 2019, interview. An original transcript of Ball's interview included several "inaudible" sections, which have recently been reviewed for accuracy and corrected, as appropriate. The audio recording of Ball's interview is attached as Exhibit B.

2

that interviews of unrestrained suspects at their workplace are not custodial in nature. *See United States v. Elliott,* 876 F.3d 855 (6th Cir. 2017); *United States v. Crossley*, 224 F.3d 847 (6th Cir. 2000); *United States v. Mahan*, 190 F.3d 416 (6th Cir. 1999).

In short, Ball's claim that he was "in custody" when he gave his statement is not supported by the totality of the circumstances, and his motion should be denied without an evidentiary hearing.

## Brief in Opposition to Motion to Supress

I. Facts

   A. The Setting

On July 25, 2019, FBI agents executed nine search warrants on SSI offices and the homes of the charged defendants. Ball was present at SSI's Standish, Michigan office building when it was searched. FBI agents approached Ball and asked if they could speak with him. Ball agreed and led them to his office in the building. (Exh. E – Sketch).[2]

Ball's office was fully enclosed and had a window in the door facing the interior of the building and a window facing the parking lot.

---

[2] A sketch of the main floor of SSI's Standish office building is attached as Exhibit E. Each location, including offices, is marked with a letter(s). Ball's office is marked "R."

3

(Exh. C). During the interview Ball was seated in a chair behind his desk and the agents were seated in guest chairs in front of the desk. The door to Ball's office, while closed to limit outside noise and distractions, remained unlocked throughout the interview. (Exh. D).

### B. The Tone and Initial Statements of the FBI Agents

In a conversational and non-threatening tone, the agents started the interview by informing Ball they were there "to get answers," Ball was not under arrest, and it was his choice to answer questions or not. (Exh. B at approximately 0:2:22; Exh. A at 3). Ball was never restrained, the agents never made a show of force, and Ball never asked to leave or stop the interview. (See Exhs. A and B generally). As the interview continued Ball made several incriminating statements but hesitated to answer why his company Southfield IT was created. *Id.* The questioning agent responded by acknowledging that it was not a normal day for Ball and asked Ball if he had any questions the agents could answer that would help him get through it. (Exh. A at 21). To further assure that Ball was comfortable continuing the interview, the agents told him if he wanted anyone else present, including a lawyer, it would be up to him, and he could discontinue questioning at any time. *Id.* at

4

22. Ball responded that he didn't know if he wanted someone with him, but he chose to continue the interview. *Id.* at 22-23.[3]

Several minutes later the interviewing agent once again reminded Ball that he was not under arrest. *Id.* at 66. At this point the lead FBI agent, Special Agent BB (S/A BB), entered Ball's office, introduced himself, and joined the interview. S/A BB called Ball a good, hard-working person who made mistakes. *Id.* at 70. Ball continued answering S/A BB's questions. Ball admitted he was sorry for what he did, and that Southfield IT was a shell company that billed MDOT for storage capacity Southfield IT did not have. Ball agreed that all charged defendants knew what was happening and called them a "five-headed monster." *Id.* at 80-81.

---

[3]Ball claims (Brief at 14) that the agents "stopped him from using his cell phone," thereby "cut[ing] off his contact with the outside world." But the facts do not support such a finding. For most of the interview, Ball's cellphone was laying on his desk within arm's reach. It rang twice during the interview, prompting the agents to say "…we're just going to have to let that ring if you don't mind. Thank you." (Exh. A at 45-46). Ball did so without objection. Later, agents informed Ball that the FBI would need to image his cell phone but would return it as soon as practicable. *Id.* at 95-97. And, at no time during the interview did Ball ask to use his cellphone or otherwise communicate with someone outside his office (see Exh. A generally).

5

### C. The Conclusion

As the interview wound down, the agents told Ball that his home was also being searched and his wife was being interviewed but assured him "he'll get through it." *Id.* at 84-86.

S/A BB went the extra mile to reassure Ball: "I really mean it. I - it's good to meet you. I don't think you're a horrible person. I think you're a hardworking person who made a mistake and I think the five headed monster, almost a group thing who just kind of started doing this together." *Id.* at 88. Ball responded that he had been ashamed for the whole five years and never should have gotten involved in management. *Id.* at 89-90.

The interview ended with the agents telling Ball they were sorry to have met him under these circumstances. *Id.* at 105. Ball told them he was sorry they had to come. *Id.*

## II. Argument

When a criminal suspect is "in custody" and subject to interrogation, certain rights attach to that individual. Under *Miranda v. Arizona*, 384 U.S. 436 (1966), police officers must inform a custodial suspect that he has a right to remain silent and to "have counsel

present . . . if [he] so desires." *Id.* at 468-70. Additionally, police are required to respect the accused's decision to exercise those rights. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." *Id.* at 473-74. Because Ball was not "in custody" when he made statements to the inquiring FBI agents, his un-Mirandized statements should not be suppressed.

### A. No *Miranda* warnings were required because Ball was not in custody.

*Miranda* protections are limited to custodial interrogations, which the Supreme Court has defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). "[F]or *Miranda* to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998), citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

A defendant seeking suppression of his statements based upon a failure to receive *Miranda* warnings must demonstrate by a preponderance of the evidence that he was subjected to a custodial interrogation. *United States v. Lawrence*, 892 F.2d 80, 989 (6th Cir. 1989) (unpublished Table decision) (quoting *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) (holding defendant "had the burden of proving that he was under arrest or in custody" when seeking suppression of statements); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation").

Courts measure *Miranda's* "in custody" requirement objectively; the proper inquiry being how "a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Therefore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a

8

particular time."[4] *Id.* To determine whether a defendant was in "custody" during an interrogation, courts look to the "totality of the circumstances." *Salvo*, 133 F.3d at 950.

Under the "totality of the circumstances" approach, courts consider several factors, including: (1) the location of the interview; (2) the length and manner of questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he did not have to answer questions. *United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009). This analysis is considered from the point of view of a reasonable person; the unique, subjective characteristics of the individual, such as age or experience with law enforcement, are not considered. *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004). Each of these factors weighs in favor of a finding that Ball was not "in custody" when he gave his statement.

---

[4] For this reason, Ball's reference to the FBI's "raid plan" (Brief. at 2) and intent to interview key SSI staff while executing the search warrants is immaterial. The Court's inquiry must be based on the facts and circumstances of Ball's interview—not an FBI plan that was not "articulated" or known to Ball at the time.

1. Location of the interview

In the context of *Miranda*, the Supreme Court and Sixth Circuit have recognized a fundamental difference between questioning that occurs in the familiar setting of one's home and questioning that occurs at a police station. *See Miranda*, 384 U.S. at 449–50. "[W]hen police question a suspect in a residence, the encounter often will not rise to the kind of custodial situation that necessitates *Miranda* warnings." *Panak*, 552 F.3d at 466 (internal quotations omitted). In *Panak*, the Sixth Circuit noted that one's home:

> presumably is the one place where individuals *466 will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave. It is the rare homeowner who has not exercised these types of control at some point in encountering uninvited visitors. No doubt, some individuals may find it more difficult to do these things during a visit by the police. But all individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house.

*Panak*, 552 F.3d at 465-66.

Likewise, at-work interviews are generally not deemed to be custodial where the room is familiar to the person being interviewed and the person's freedom of movement is unrestrained. This is so *even if*

10

the person being interviewed is *not* told he or she can refuse to answer. *See United States v. Elliott*, 876 F. 3d 855, 867 (6th Cir. 2017).

In *United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000), the defendant was not present when the agents arrived at her workplace but was called in by her military supervisors and told to go to a conference room where she was met by FBI agents. She argued that any reasonable person would have believed they were not free to leave. *Crossley*, 224 F.3d at 861-62. The court disagreed and found that even under these circumstances, a workplace interview in an unlocked classroom with windows was not deemed custodial where there was no show of force, and the environment was not hostile or coercive. *Id.* at 862. Here, Ball agreed to speak with agents, took them to his own office, and answered their questions. Similarly, in *United States v. Mahan*, 190 F.3d 416, 421-22 (6th Cir. 1999), a workplace interview in two unlocked rooms—neither of which was the subject's office—was not deemed custodial where the subject was unrestrained, there was no show of force (i.e., handcuffs or brandishing of firearm), and the environment was not hostile or coercive (i.e., no threats).

11

Like in *Crossley* and *Mahan*, Ball was interviewed in his office, a place with which he was very familiar. Ball was asked by the agents whether he was willing to talk to them, he agreed and made the decision that the interview would take place in his office. Ball was not handcuffed during his interview and was told he would not be. He was not arrested and was told he would not be. Ball was allowed to sit behind his desk and the agents sat in guest chairs in front of the desk. The door, while closed, was never locked, and Ball was told he could end the interview at any point. Ball willingly agreed to speak with the interviewing agents.

    2. <u>Length and manner of questioning</u>

Defendant's interview lasted for approximately two hours and 15 minutes. Although this length of time is a bit longer than other interviews deemed non-custodial, the length is not unusual given the circumstances. Namely, about an hour and 28 minutes into the interview, there was a 10-minute break, and then the lead agent joined the interview for the first time and covered several new areas of inquiry. *See Panak*, 552 F. 3d at 467 (interview between 45 minutes and an hour not custodial); *United States v. Crossley*, 224 F.3d 847, 862 (6th

12

Cir. 2002) (interview of less than an hour not custodial); *United States v. Mahan*, 190 F. 3d 416, 420, 422 (6th Cir. 1999) (interview lasting one hour and thirty-five minutes not custodial); *Mason v. Mitchell,* 320 F.3d 604, 612 (6th Cir. 2003) (interview lasting four hours not custodial). Ball's interview was not confrontational. The agents did not raise their voices or threaten Ball, and they repeatedly told him he was not under arrest (once at the beginning of the interview and three more times during the interview) and could end the interview if he wanted.

        3.    <u>Restraint on the individual's freedom of movement</u>

The Sixth Circuit has consistently found *Miranda* warnings not required for at-work interviews not involving any restraint on an individual's freedom of movement. *Elliott,* 876 F.3d at 855 (interview conducted in a room the defendant was familiar with and where she was not threatened was not custodial); *Crossley,* 224 F.3d at 861-62 (where officer produced search warrant related to child pornography and told defendant he was free to leave, yet defendant remained and continued talking to officer, *Miranda* warnings not required); *Mahan,* 190 F.3d at 421-22 (*Miranda* warnings not required where agents informed defendant that he was not under arrest). Ball was not

handcuffed or physically restrained during his interview with law enforcement. The agents maintained a conversational tone with Ball, never threatening him or displaying their firearms. And, while he never sought to leave his office, the agents told him he could end the interview whenever he wished.[5]

### 4. Whether the individual was told that he did not have to answer questions

In *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003), the Sixth Circuit stated that "[m]ost important to our analysis, though, is that Swanson was explicitly told by [law enforcement] that he was not under arrest and that he did not have to speak with him if he did not choose to." In *Swanson*, the Court emphasized its prior holding in *Salvo*, noting that "a statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis

---

[5] Ball suggests (Brief at 11 n.21, 12 n.26, and 17-18 n.38, citing *California v. Hodari D.*, 499 U.S. 621 (1991)) that a person's "submission to the assertion of authority" is part of the legal standard to be applied by the Court. Not so. *Hodari D.* is a Fourth Amendment "seizure" case—not a Fifth Amendment "in custody" case. The Sixth Circuit has made clear that the applicable legal standards differ. *See Salvo*, 133 F.3d at 949 ("The distinction between these two tests is apparent in the Sixth Circuit's opinion in *United States v. Knox*, 839 F.2d 285, 289–291 (6th Cir. 1988), in which this Court used different tests for the Fourth Amendment and Fifth Amendment inquiries.").

of whether the suspect was 'in custody.'" *Id.*, citing *Salvo*, 133 F.3d at 951. See also *United States v. Sivils*, 960 F.2d 587, 598 (6th Cir. 1992) (defendant not in custody where he was informed before questioning that he was not under arrest); *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (record would not support finding that defendants were in custody where told that they were not under arrest and were free to terminate questioning at any time). Here, as in *Swanson* and *Salvo*, Ball was explicitly told that he was not under arrest. (Exh. A at 2-3, 66). Ball was also told that he did not have to answer questions, and that he could stop answering questions at any time. (*Id.* at 3, 22).[6] In sum, Ball was never in custody, so he was not entitled to *Miranda* protections.

---

[6] Ball references (Brief at 4) his question to the agents of "should we have legal counsel?" But he does not claim he invoked a right to counsel that was improperly refused. Nor could he. First, a suspect who is not "in custody" is not entitled to counsel under *Miranda*. *United States v. Malcolm*, 435 Fed. App'x 417, 422 (6th Cir. 2011), citing *United States v. Mathiason*, 429 U.S. 492, 494-95 (1977). Second, when a suspect's reference to a lawyer falls short of an unequivocal request to have one present, interviewing officers are under no obligation to ask for clarification or cease questioning. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *United States v. Amawi*, 695 F.3d 457, 485 (6th Cir. 2012).

## Conclusion

The court should deny the Motion to Suppress Ball's statement.

                Respectfully Submitted,

                Julie A. Beck
                Acting United States Attorney

                *s/ Karen L. Reynolds*
                Karen L. Reynolds
                T. Patrick Martin
                Assistant United States Attorneys
                211 West Fort Street, Suite 2001
                Detroit, Michigan 48226
                Karen.Reynolds@usdoj.gov
                Thomas.Martin@usdoj.gov

Dated:  February 14, 2025

### CERTIFICATE OF SERVICE

     I hereby certify that on February 14, 025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification to all Counsel of record.

Dated: February 14, 2025                *s/Jennifer Streeter*
                                            Legal Administrative Specialist