UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

ADAM BALL,

       Defendant.
_____/

Case No. 1:23-cr-20676-3

Honorable Thomas L. Ludington
United States District Judge

**OPINION AND ORDER DENYING DEFENDANT BALL'S MOTION TO SUPPRESS**

Defendant Adam Ball—currently charged as part of a five-defendant conspiracy to commit wire fraud and defraud the United States—made a series of incriminating statements during an interview with the FBI on July 25, 2019. He now seeks to suppress these statements because the interviewing FBI agents did not read him his *Miranda* warnings. But, as explained below, they need not have. Defendant Ball's interview was noncustodial. So *Miranda* warnings were unnecessary, and Defendant Ball's statements will not be suppressed.

**I.**

Defendant Adam Ball is currently charged—alongside Codefendants Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, and Anthony Thelen—with conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count I); conspiracy to defraud the United States, 18 U.S.C. § 371 (Count II); and thirteen counts of wire fraud/aiding and abetting, 18 U.S.C. § 1342/18 U.S.C. § 2 (Counts III–XIV).[1] ECF No. 132. All charges arise from Defendants' alleged conduct involving Surveying

---

[1] This Court recently granted Defendants' unopposed motion to dismiss one of the substantive wire fraud counts as barred by the applicable statute of limitations, *see* ECF No. 233, so the Counts of the operative Indictment have been renumbered for clarity.

Solutions Inc. (SSI), Michigan's "premier" construction and surveying consulting firm. *See About*, SSI, https://ssi-mi.com/about/ (last accessed May 13, 2025) [https://perma.cc/T2TW-EQVV]. Generally, the Government alleges that Defendants equally controlled SSI and used it, and three affiliated shell companies, to defraud the United States of millions of dollars through federally funded contracts with the Michigan Department of Transportation (MDOT) from early 2011 through mid-2019. *See id.* at PageID.1508 (alleging "80-90%" of the relevant contracts between SSI and MDOT were funded by the United States Department of Transportation through the Federal Highway Administration).

**A. Factual Background**

Defendants' offense conduct is neatly distilled into three parts. This Court has detailed the relevant factual and regulatory background for each part in several prior Opinions. *See, e.g.*, *United States v. Bartlett*, 731 F. Supp. 3d 836, 840–49 (E.D. Mich. 2024), *aff'd sub nom. United States v. Semenchuk*, No. 24-1405, 2024 WL 4751486 (6th Cir. Oct. 18, 2024); *United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 4642857, at *1–8 (E.D. Mich. Oct. 31, 2024). Only the most important information will be repeated here.

*Part one.* First, the Government alleges that Defendants conspired to fraudulently obtain and maintain SSI's certification as a Disadvantaged Business Enterprise (DBE) to obtain preferential status when bidding on transportation contracts with MDOT. *See id.* at PageID.1513–16. In short, the United States Department of Transportation (USDOT) created the DBE Program to increase small and diverse business participation in the government contracting industry and requires state transportation agencies that receive federal funding—like MDOT—to set certain DBE participation goals in certain contracts. *See Bartlett*, 2024 WL 4642857, at *2. But only

independent, small businesses, owned by a socially or economically disadvantaged individual, can be certified as DBEs. *Id.*; *see also* 49 C.F.R. §§ 26.65(a), 26.69(a), 29.67(a)(1), and 26.71(g).

The Government alleges that all five Defendants signed a "Secret Agreement" in 2011 that each would equally own a 20% share of SSI, along with the additional entities in the "SSI Group"—2SI Development, LLC (2SI); 3SI Building and Leasing, LLC (3SI); and Southfield IT. *See* ECF No. 132 at PageID.1511, 1514–15. Yet despite this agreement, the Government alleges Defendants falsely and repeatedly represented to MDOT that Defendant Andrew Semenchuk—an Asian Pacific Islander—was the sole owner of SSI. *See id.* at PageID.1515. And the alleged goal of these misrepresentations was simple: falsely certify SSI as a DBE so it may receive more contracts, and Defendants may have more opportunities to overbill MDOT on artificial expenses. *See generally* ECF No. 132. Indeed, seemingly in celebration of SSI's false DBE certification, Defendant Jeffrey Bartlett emailed all other defendants as follows:

> Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure.

*Id.* at PageID.1516 (emphasis in original).

**Part two.** This brings us to Defendants' alleged overbilling. Generally, once SSI completed a contract—regardless of whether it was awarded because of SSI's DBE status—MDOT paid SSI an 11% profit margin and reimbursed SSI for (1) its direct labor costs, and (2) its other reasonably-incurred expenses, as part of SSI's annual "overhead rate." *See Bartlett*, 2024 WL 4642857, at *4–5 (internal record citations omitted). But the Government alleges Defendants artificially created and inflated both types of reimbursement expenses.

First, the Government alleges Defendants artificially inflated SSI's direct labor costs by billing MDOT for the work of their spouses and romantic partners, even though such partners never meaningfully worked for SSI. *See* ECF No. 132 at PageID.1510, 1519–20. Indeed, in

- 3 -

September 2015, Defendant Jeffrey Bartlett sent all other Defendants an email titled "Our Hours," which stated they would "have a tough time billing out projects if [they] d[id] not have more time to put on them that is *semi-legitimate.*" ECF No. 113-2 at PageID.1352 (sealed) (emphasis added). Defendant Ball asked the group whether Defendants could "raise hours/wages for [their] wives." *Id.* Defendant Jeffrey Bartlett responded that Defendants "may have to give [their wives] bigger raises[.]" *Id.* And, in May 2016, Defendant Semenchuk emailed all Defendants suggesting they tell MDOT that their wives "performed marketing duties" because Defendants gave their wives "large bonuses" which "need[ed] to [be] justif[ied]." ECF No. 113-3 at PageID.138. At bottom, the Government estimates that, from 2016 through 2018, Defendants billed MDOT over $850,000 to compensate for the work their wives never performed. *Bartlett*, 2024 WL 4642857, at *6–7 (citing ECF No. 88-1 at PageID.480 (sealed)).

Second, at the core of its case, the Government alleges Defendants fraudulently increased SSI's reimbursable overhead rate by charging MDOT rental expenses that SSI never incurred. Contractors may generally include rental costs in purported overhead expenses, subject to reimbursement. *See* 48 C.F.R. § 31.205-36. But, critically, if a contractor rents real or personal property from a *commonly controlled entity*, federal regulations prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the *normal costs of ownership*: "depreciation, taxes . . . and maintenance" for the specific piece of rented property. 48 C.F.R. § 31.205–36(b)(3); *see also* ECF No. 132 at PageID.1518.

Recall that all Defendants allegedly agreed in writing in 2011 that they would equally own SSI, 2SI, 3SI, and Southfield IT.[2] Yet the Government alleges Defendants concealed this—and other—evidence of common control from MDOT to obtain inflated reimbursements for rental costs. *See Bartlett*, 2024 WL 4579926, at *5–7. And each entity had a distinct role to play.

2SI was SSI's equipment supplier. Organized in 2004 by Defendant Brian Bartlett, 2SI rented company cars and surveying equipment to SSI. *Id.* at *5. The government alleges SSI fraudulently sought MDOT's reimbursement for these rental costs in full, and MDOT auditors estimate that, as a result of Defendants' fraudulent misrepresentations, from 2016 through 2018 alone, SSI overbilled MDOT nearly $4,000,000 for surveying equipment rentals and an additional $2,000,000 for company car rentals from 2SI. *See id.* at *5-6 (detailing examples of this overbilling).

3SI was SSI's landlord and leased SSI its offices and headquarters in St. John's and Standish, Michigan. ECF No. 88-1 at PageID.468 (sealed). Co-founded in 2009 by Defendants Bryan Bartlett, Jeffrey Bartlett, and Anthony Thelen, 3SI had no clients other than SSI, and, from 2016 through 2018, received 99% of its funding through SSI. *Id.* at PageID.467, 478. Had Defendants disclosed this alleged common control, the Government alleges, SSI only would have received reimbursements for the "normal costs of ownership" on these properties, such as taxes, depreciation, and maintenance expenses. ECF No. 132 at PageID.1518–19; *see also* 48 C.F.R. § 31.205–36(b)(3). But, by allegedly concealing this common control, Defendants overbilled MDOT

---

[2] Southfield IT was not listed in the 2011 Secret Agreement because it was not created until after the Secret Agreement was signed. But Defendants included Southfield IT in the SSI Group and ensured that, consistent with all other SSI Group entities included in the 2011 Secret Agreement, each Defendant received an equal 20% share of Southfield IT's profits at the end of each fiscal year. *See* ECF No. 113-1 at PageID.983 (sealed).

for SSI's property rental costs to 3SI by over $500,000 from 2016 through 2017. ECF No. 88-1 at PageID.508 (sealed).

Southfield IT was, as its name suggests, SSI's IT provider. Once Southfield IT's account was opened, the Government alleges that 99.9% of its funding was furnished through SSI and Defendants. *Id.* at PageID.464–65; *see also* ECF No. 132 at PageID.1517. The Government also alleges that 95.9% of these funds were "ultimately transferred back" to Defendants and their spouses. ECF No. 132 at PageID.1517; *see also* ECF No. 88-1 at PageID.465 (sealed) (listing withdrawals from Southfield IT's bank account from January 2016 through 2019). Despite this evidence of common control, Defendants allegedly told MDOT that Southfield IT was independent from SSI, and created "fictitious contracts and invoices" between the two companies to "fraudulently inflate their overhead costs which were then reimbursed by MDOT." ECF No. 132 at PageID.1516. SSI billed MDOT a total of *$1,575,304.30* for IT services it purportedly purchased from Southfield IT throughout FY 2015, 2016, and 2017. ECF No. 88-1 at PageID.463 (sealed). But the Government alleges that SSI actually spent "less than *$145,184.73* on IT services . . . from January 2016 through February 2019." *Id.* (emphasis added). MDOT estimates that, from 2016 through 2018, it overpaid SSI nearly $2,000,000 "as a result of [Defendants'] fraudulent representations regarding IT expenditures." *Id.* at PageID.467.

The Government also uncovered evidence suggesting that—unlike the other SSI Group shells—Southfield IT was nothing more than a pass-through entity. Throughout its investigation, the FBI interviewed "Individual A," the owner of Network Services Group (NSG). *Id.* at PageID.466–67. Individual A reported to the FBI that NSG—rather than Southfield IT—provided SSI with IT services as early as 2009. *Id.* at PageID.466. Defendants' emails corroborate this interview. On December 31, 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian

Bartlett, and Jeffrey Bartlett an email entitled "SSI IT Company," which noted that all Defendants had discussed "forming an IT company for OH reasons"[3] and suggested that "all of [NSG']s bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." ECF No. 113-1 at PageID.1007 (sealed). All other Defendants replied in agreement. *Id.* at PageID.1008. 1010, 1012–13. In accordance with these emails, Individual A reported to the FBI that, in early 2016, Defendant Semenchuk "began directing [him] to re-issue certain SSI invoices to Southfield IT," such that he "understood that NSG's work always supported SSI regardless of [whether] it was billed to SSI or Southfield IT[.]" ECF No. 88-1 at PageID.467 (sealed).

*Part three.* But where did the Defendants' alleged overbilling profits go? According to the Government, all proceeds were funneled directly and indirectly back to Defendants and their spouses. ECF No. 132 at PageID.1520–22. Indeed, the Government alleges Defendants personally benefit from the fruits of their alleged fraudulent overbilling labor by "equalizing" the income of all SSI Group companies—SSI, 2SI, 3SI, and Southfield IT—such that each Defendant received, consistent with the 2011 Secret Agreement, their 20% share of the Group's net income at the end of each fiscal year. *Id.* To do so, the Government alleges Defendants offered fictitious "loans" to one another and took fake loans from the SSI Group entities, with the expectation that the loans would never be repaid. *Id.*; *see also Bartlett*, 2024 WL 4579926, at *8.

### B. Investigative Background and Defendant Ball's Interview

Defendant Ball seeks to suppress incriminating statements he made to the FBI on July 25, 2019, throughout its investigation and search of the SSI Group's corporate offices and Defendants' personal residences. ECF No. 178. Much of the relevant investigative background has also been

---

[3] The Government alleges that "OH" referred to SSI's reimbursable overhead rate. *See* ECF No. 113-1 at PageID.974–75.

explained in a prior Opinion resolving Defendants' prior joint-motion to suppress, which challenged the sufficiency of the underlying warrants. *See United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 4533554, at *9–11 (E.D. Mich. Oct. 21, 2024) (finding probable cause for all search warrants and concluding all warrants were sufficiently particular and not unconstitutionally overbroad).

The relevant facts surrounding Defendant Ball's interview are not disputed. The FBI arrived at SSI's Standish Headquarters around 8:00 AM on Thursday, July 25, 2019. *See* ECF No. 183-1 at PageID.1860 (sealed). Because it was a workday, many SSI employees—including Defendant Ball—were present during the search. So the FBI directed all employees to the first floor of the multi-story headquarters, asked them to present their identification, and then allowed them to leave. *See id.*; *see also* ECF No. 178 at PageID.1801–02; 178-3 at PageID.1832 (sealed) ("[A]ll . . . non-essential employees will be permitted to leave the business."). But not Defendant Ball. The FBI identified Defendant Ball, like all other Codefendants, as a "target subject," a "necessary" and "essential" SSI employee.  ECF No. 178-3 at PageID.1825, 1832 (sealed). Accordingly, FBI agents recognized him and asked if he knew of a "quiet[] place" for an interview. ECF No. 178 at PageID.1802; *see also* ECF No. 178-3 at PageID.1832 (sealed) ("Necessary SSI staff will be identified by [Special Agent] Smith for interviews). Defendant Ball volunteered his personal office. ECF Nos. 178 at PageID.1802; 198 at PageID.2164.

Defendant Ball's office was fully enclosed and had multiple windows. *See* ECF No. 198-3.  Inside was Defendant Ball's desk, two guest chairs, and personal mementos including pictures of his children. *See* ECF No. 198-4. During the interview, Defendant Ball sat behind his desk and each of the two interviewing agents sat in his guest chairs. ECF Nos. 178 at PageID.1802; 198 at PageID.2165. The door to Defendant Ball's office was closed but not locked. *See* ECF Nos. 198

- 8 -

at PageID.2165; 201 at PageID.2296. The interview lasted two hours and fifteen minutes.[4] At the outset, the interviewing FBI agents informed Defendant Ball that he was not under arrest and need not answer any of their questions:

> **FBI Agent**: I mean our point today is just to try to get some answers. Uh, nobody's under arrest. Nobody's getting cuffs, nothing like that.
> **Defendant Ball**: Okay.
> **FBI Agent**: [A]s far as that goes . . . if you wanted to start answering questions, talking to us, that's fine and then . . . if you don't want to answer questions at some point, I mean that's . . . part of your right too.
> **Defendant Ball:** Okay.
> **FBI Agent**: So we'll — I mean we'll respect that as your decision.

ECF No. 198-2 at PageID.2180–81.

And the interviewing FBI agents repeated these assurances throughout the interview. Over twenty minutes into the interview, Defendant Ball hesitated to explain why Defendants created Southfield IT. *Id.* at PageID.2198 ("I mean . . . are we getting into an area where I don't know[.] I don't know."). The interviewing FBI agents responded by reminding Defendant Ball that he could "discontinue questioning at any time." *Id.* at PageID.2200 (additionally asking whether an attorney or anyone else's presence would make Defendant Ball feel more comfortable). An hour later, the interviewing FBI agents reiterated that Defendant Ball was not under arrest. *Id.* at PageID.2244 ("[U]ltimately, we're not just going to, you know, we're not going to go away today. We're not arresting you. You're not getting arrested. Nobody's getting arrested, but . . . we're going to get the answers to [our] questions eventually.").

Yet Defendant Ball never refused to answer a question and never asked the interviewing FBI agents to stop. *See generally* ECF No. 198-2. Indeed, when Defendant Ball hesitated to answer

---

[4] The Government attached an audio recording (the "Recording") of Defendant Ball's interview to its response in opposition to Defendant Ball's Motion to Suppress, under seal. *See* ECF No. 198-1 at PageID.2178. The media file does not appear on the docket but remains on electronic file with this Court. *See* ECF Nos. 199; 200.

questions, he clarified that he was not declining to answer but, instead, could not recall or form an appropriate answer:

> **FBI Agent**: Southfield IT . . . was established [as a] shell company to inflate your overhead rates for SSI, correct.
> **Defendant Ball:** I can't answer that.
> **FBI Agent**: [I]t was one of three companies that were formed to essentially do that. Your shell companies related to the ownerships. The owners of SSI to inflate your overhead rate.
> **Defendant Ball.** I can't answer that, I don't know.
> **FBI Agent**: You can['t] or you won't?
> **Defendant Ball**: Just can't. The companies are formed for a lot of different reasons[.]

*Id.* at PageID.2233–34.

Throughout this interview, Defendant Ball admitted to many of the operative allegations in the Second Superseding Indictment. For starters, he admitted that his wife worked "zero hours" for SSI or Southfield IT. *See id.* at PageID.2212–15. (stating she worked for SSI as his "administrative assistant" but he "d[id]n't give her any work"); *see also id.* at PageID.2225 (answering "no" to the question asking whether he ever saw his wife or any of his Codefendants' wives "show up for work"). And Defendant Ball stated that all five Defendants collectively decided how to compensate their wives for this invisible work:

> **FBI Agent**: Are there other people making -- are you working in cooperation with other people? . . . Are -- are you sitting down at the table with -- with Jeff? With Brian? And -- and others from SSI to make the decision?
> **Defendant Ball**: I would say yes[.]
> **FBI Agent:** So Jeff Bartlett. Brian Bartlett. Yourself and who else?
> **Defendant Ball**: At the time it would have been probably Andy . . . Semenchuk.
> **FBI Agent**: Semenchuk. Okay. Anybody else?
> **Defendant Ball**: Um, Tony Thelen. . . .
> **FBI Agent**: Okay. So the five of you were making decisions on disbursing funds for both SSI as well as Southfield IT Group?
> **Defendant Ball**: I would -- I would say yes.

*Id.* at PageID.2218–19.

Ball made many incriminating statements about the alleged overhead rate overbilling, too. For example, he agreed that Defendants created Southfield IT as a "shell company":

> **FBI Agent**: [I]t looks to me like Southfield IT . . . is nothing more than[] a shell company. Would[] you concur with that?
> **Defendant Ball:** Probably. Yeah.
> **FBI Agent:** [Y]ou said probably. [Y]ou're in agreement, correct?
> **Defendant Ball:** I would have to be, yeah.
>   . . .
> **FBI Agent**: I want to thank you for your cooperation. . . . We're almost done. It's just that . . . the one sticking point as to the purpose of Southfield IT['s] existence.
> **Defendant Ball:** I don't know, to make a profit.
> **FBI Agent**: And [its] only customer [was SSI]?
> **Defendant Ball:** Correct.

ECF No. 198-2 at PageID.2198, 2222. Indeed, Defendant Ball agreed with the interviewing FBI agents that SSI expensed an $811,000 invoice from Southfield IT for 306 terabytes of storage when Southfield IT could only provide about 70 terabytes of storage, and SSI only paid about $30,000 for their IT storage expenses:

> **FBI Agent**: It's total bulls\*\*t. [Southfield IT] d[id]'t have the storage. And [in comparison to the amount SSI actually spent on storage], you[] way, way, way, way, way, way, way overbilled that and you know you did. Correct?
> **Defendant Ball:** I do.

*Id.* at PageID.2259 (additionally answering "right" to the question asking whether Defendants "billed [MDOT] for storage capacity [that Southfield IT didn't] have"); *see also id.* at PageID.2232–33.

And Defendant Ball admitted that he *knew* using Southfield IT as a shell would fraudulently and artificially inflate SSI's overhead rate, resulting in overbilling MDOT:

> **FBI Agent**: But you knew that overhead rate . . . you know how . . . it works.
> **Defendant Ball:** I know. I know how it works basically. Yes.
> **FBI Agent**: And you knew that expenses to a shell company . . . that didn't actually occur would be applied to [SSI's] overhead rate.
> Defendant Ball: Yeah.
> **FBI Agent**: And you knew when that overhead rate got [f]atter; more money would be disbursed from the State of Michigan to SSI.

- 11 -

> **Defendant Ball**: I understand how that process work[s,] yes.
> **FBI Agent**: You understand -- you also understand that that's what happened correct?
> **Defendant Ball**: Yes.

*Id.* at PageID.2254.

There's more. Defendant Ball even stated that *all* Defendants knew about and agreed to this overbilling scheme, volunteering that the Defendants were a "five-headed monster":

> **FBI Agent:** So who's idea was it then to be like well we've got this company. It's already set up. Let's go ahead and tweak it[?]
> **Defendant Ball**: Probably all of ours.
> **FBI Agent:** Did you guys have meetings where you talk about these things?
> **Defendant Ball:** Yeah.
>
> . . .
>
> **FBI Agent:** You knew. Tony Thelen knew. Jeff Bartlett knew. Brian Bartlett knew. And [Andy] Semenchuk knew. Correct?
> **Defendant Ball**: I would say that's correct.
> **FBI Agent:** It sounds like this wasn't, there wasn't a ring leader right? No one person was directing it. You guys were kind of all marching together on this, huh?
> **Defendant Ball:** It was a five-headed monster. Yeah.

*Id.* at PageID.2256–57, 2259–60.

At bottom, Defendant Ball agreed that he and his Codefendants "g[o]t money from the State of Michigan that [they] weren't entitled to[.]" *Id.* at PageID.2261. Towards the end of the interview, he stated that he was "sorry" for what he had done and felt "sick to his stomach." *Id.* at PageID.2258–59. He recognized that what he and his Codefendants did was "not okay," that he had "been ashamed" throughout his entire involvement in SSI, and that he "regret[s] the day [he] started getting involved in" SSI's "management." *Id.* at PageID.2259, 2268.

On December 20, 2024, Defendant Ball filed a Motion to Suppress his statements because, he argues, he was subject to custodial interrogation but never received *Miranda* warnings. ECF No. 178. After stipulated adjournments, the Government responded on February 14, 2025, ECF No. 198, and Defendant Ball filed a reply on February 28, 2025. ECF No. 201.

## II.

The infamous *Miranda* warnings arose as prophylactic Fifth Amendment protection. In *Miranda v. Arizona*, the Supreme Court held that, before an individual is subject to custodial interrogation, law enforcement officers must expressly inform them (1) of their right to remain silent, (2) that anything they say may be used against them, and (3) of their right to an attorney, even if they cannot afford one. 384 U.S. 436 (1966). Absent these three warnings, given the "inherently compelling pressures" of custodial interrogation, an individual's Fifth Amendment privilege against self-incrimination is not meaningful. *Id.* at 467. So, these warnings are an "absolute prerequisite" to custodial interrogation. *Id.* And, without them, "the fruits of a custodial interrogation are inadmissible at trial." *McCarty v. Herdman*, 716 F.2d 361, 363 (6th Cir. 1983), *aff'd sub nom. Berkemer v. McCarty*, 468 U.S. 420 (1984).

But not all law enforcement interviews rise to the level of custodial interrogation. Indeed, *Miranda* does not apply "simply because the questioning takes place in the station house, or before the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Interrogation is defined as express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (noting law enforcement interrogates an individual by asking questions "reasonably likely to evoke an incriminating response"). An individual is only in custody for *Miranda* purposes if they are under formal arrest or, "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983). Four "non-exhaustive factors" guide this analysis: "'(1) The location of the interview; (2) The length and manner of the questioning; (3) Whether there was any restraint on the individual's freedom of movement, and (4) Whether the

individual was told that he or she did not need to answer the questions.'" *United States v. Williams*, 998 F.3d 716, 736 (6th Cir. 2021) (quoting *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010)).

### III.

The Government does not dispute that the FBI interrogated Defendant Ball during the July 25, 2019 interview. *See* ECF No. 178. Nor could it. The questions were direct and reasonably likely to elicit incriminating responses. *See generally* ECF No. 198-2. Thus, the only issue is whether Defendant Ball was in "custody" during his interview. Under the totality of the circumstances, he was not.[5]

Begin with the location of Defendant Ball's interview. He was not questioned at the FBI's office. *Cf. United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) ("The FBI office is inherently more intimidating than . . . a business office[.]"). He was not questioned in a windowless, dark, or unfamiliar room. Instead, at his own suggestion, he was interviewed in his own office. This familiar location suggests Defendant Ball was not in custody. *See, e.g.*, *United States v. Elliott*, 876 F.3d 855, 866 (6th Cir. 2017) (finding defendant interviewed in "her place of business, in an exam room that she was familiar with" was not in custody for *Miranda* purposes); *United States v. Mahan*,

---

[5] Defendant Ball requests an evidentiary hearing to resolve this issue. *See* ECF No. 178 at PageID.1817–18. But he is not entitled to one. Evidentiary hearings are only required to resolve motions to suppress when there are underlying disputed questions of fact. *See United States v. Ickes*, 922 F.3d 708, 713 (6th Cir. 2019); *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006); *United States v. Maclin*, 393 F. Supp. 3d 701, 713 (N.D. Ohio 2019) (denying defendant's request for an evidentiary hearing to resolve a motion to suppress on *Miranda* grounds because "there [wa]s no dispute of material fact"). Here, the Parties do not dispute the relevant facts surrounding Defendant Ball's July 25, 2019 interview. *Compare* ECF No. 178 *with* ECF No. 198. Moreover, the Parties have provided this Court with a transcript and audio recording of the entire interview, as well as pictures of the interview location. *See* ECF No. 198-2. Thus, an evidentiary hearing is unnecessary.

190 F.3d 416 (6th Cir.1999) (finding an employee questioned at work was not subject to custodial interrogation); *United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000) (same).

The second factor—the length and manner of questioning—is neutral. On one hand, Defendant Ball was questioned for over two hours.[6] Although not dispositive, the Sixth Circuit recognizes that such length generally "supports" a finding of custody. *United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018); *but see Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (finding four-hour interview was not custodial after reviewing all relevant factors). On the other hand, the manner of the interview was respectful. This Court has reviewed the audio recording of Defendant Ball's interview. *See generally* Recording. The interviewing "agent[s'] tone[s] w[ere] not hostile or aggressive." *United States v. Martinez*, 795 F. App'x 367, 374 (6th Cir. 2019). Moreover, the agents repeatedly told Defendant Ball that they thought he was a "good person," ECF No. 198–2 at PageID.2259, 2268, and that they respected his surveying work, *id.* at PageID.2255. The agents asked if there was anything they could do to make Defendant Ball more comfortable throughout the interview and afterwards. *Id.* at PageID.2200, 2269. And, when Defendant Ball became emotional and upset towards the end of the interview, the agents reassured him that he would "weather [this] storm," that his "life [wa]sn't over," and that he could "recover from this." *Id.* at PageID.2271–73. Indeed, the agents also ensured that Defendant Ball was not contemplating self-harm, and told him that his well-being and safety were their "primary concern[s]." *Id.* at PageID.2271. So the respectful manner of the FBI's questions "undercut[s]" any finding of custody. *Martinez*, 795 F. App'x at 375 (finding defendant was not in custody, in

---

[6] At the conclusion of the interview, Defendant Ball seemingly apologized to the interviewing agents for "wast[ing] so much" of their time at the beginning of the interview. *See* ECF No. 198-2 at PageID.2272, *see also* Recording 2:06:26.

part, because the interviewing agents respected the defendant throughout the interview by commending his work, offering him the chance to tell his "side" of the story).

Turning to the third factor, Defendant Ball's freedom of movement was nowhere near restricted to the "degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125. He was not handcuffed or otherwise prevented from moving. *See* ECF No. 198-2 at PageID.2181. The agents did not brandish firearms or "any other equipment ordinarily associated with formal arrest or custody." *Mahan*, 190 F.3d at 422. And the agents "at no time made any show of force." *Id.* It matters not that the door to Defendant Balls' office was closed, or that a uniformed agent sat in a guest chair between his desk and the door. *Elliot*, 876 F.3d at 866–67 (noting closed doors and police presence "do not suffice to make an interrogation custodial, especially when the venue is a familiar one"); *see also Mahan* 190 F.3d at 422 (finding defendant's "freedom of movement was unrestrained throughout the interview" when doors were closed but unlocked). Thus, this factor further suggests Defendant Ball was not in custody during his July 25, 2019 interview.

The fourth custody factor is "most important." *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003); *see also Howes*, 565 U.S. at 515. Indeed, the Sixth Circuit has recognized that, when interviewing officers inform the interviewee that they are free to leave or to refuse to answer questions, such assurance "likely . . . guarantee[s]" that the following interview is noncustodial. *United States v. Panak*, 552 F.3d 462, 468 (6th Cir. 2009); *see also Martinez*, 795 F. App'x at 371 ("This makes sense, since the *Miranda* custody determination is an objective test; the ordinary person who is told he is free to leave will usually understand that to be the case."). Here, the interviewing agents expressly—and repeatedly—told Defendant Ball that he was not under arrest and need not answer their questions. ECF No. 198-2 at PageID.2181, 2200. This "cuts heavily" against a finding of custody. *Martinez*, 795 F. App'x at 371.

Thus, with a score of 3-0-1, the relevant factors reflect that Defendant Ball was not in custody during his interview on July 25, 2019. But, as explained, these factors are "non-exhaustive." *Williams*, 998 F.3d at 736. So Defendant points to two additional circumstances that he suggests support a finding of custody and show that a reasonable person in his position would not have felt able to terminate the interrogation and leave. Neither do.

First, Defendant Ball argues that he was deprived of his cell phone and suggests—without citing any legal authority—that "[d]enying access to one's handheld personal computer, even for a short period of time, is its own form of custody." ECF No. 178 at PageID.1813. But Defendant Ball was never deprived of his cell phone. It was on his person during the entire two-hour interview. Interviewing agents simply asked him, on one occasion, not to answer a call. *See* ECF No. 198-2 at PageID.2223–24. ("[W]e're just going to have to let that ring, if you don't mind. Thank you."). And although at least one district court within the Sixth Circuit recognized that "[d]iscouraging an interviewee from answering calls . . . does restrain their freedom to a degree," it held that such "slight imposition is insufficient to make the interview custodial" in light of the other factors which—like here—suggest the interview was noncustodial. *United States v. Grenkoski*, 645 F. Supp. 3d 669, 678 (E.D. Ky. 2022). Without more, the agents' request that Defendant Ball not answer one phone call does not suggest that a reasonable person in his position would have felt unable to terminate the interview or leave.

Second, Defendant Ball argues that he was in custody because, just before his interview, he observed the FBI permit his "non-essential" coworkers to leave. ECF No. 178 at PageID.1812–14. So, in comparison, when the FBI approached him and asked if he knew of a quiet place to talk, he reasonably felt that he could not say no. *Id.* At that precise moment, perhaps. But minutes later, once Ball directed the agents to his office, the agents immediately and expressly informed him that

he was not under arrest and did not have to answer any of their questions. ECF No. 198-2 at PageID.2181; *see also id.* at PageID.2200 (reminding Defendant Ball that he could "discontinue questioning at any time"). At that point, especially in light of the other relevant factors discussed above, no reasonable person would feel unable to terminate the interview. So the interview was not custodial, *Miranda* warnings were not necessary, and the statements Defendant Ball volunteered throughout the two hours that followed will not be suppressed.

IV.

Accordingly, it is **ORDERED** that Defendant Ball's Motion to Suppress, ECF No. 178, is **DENIED.**

**This is not a final order and does not close the above captioned case.**

Dated: June 10, 2025                    s/Thomas L. Ludington
                                         THOMAS L. LUDINGTON
                                         United States District Judge